93 Cal.Rptr.2d 36 (2000)
22 Cal.4th 316
993 P.2d 366
Monique ETCHEVERRY et al., Plaintiffs and Appellants,
v.
TRI-AG Service, Inc., et al., Defendants and Respondents.
No. S072524.
Supreme Court of California.
March 2, 2000.
*37 Souza, Coats, McInnis, Mehlhaff & Hay, Mehlhaff & Hay and Robert Mehlhaff, Tracy, for Plaintiffs and Appellants.
The Alexander Law Firm, Richard Alexander, Amanda Hawes, Santa Rosa, Ann Saponara; and Jose Padilla, Los Angeles, for Rural Legal Assistance Foundation and Trinidad Elias as Amici Curiae on behalf of Plaintiffs and Appellants.
Public Citizen Litigation Group, Erica Craven and Allison M. Zieve, Washington, D.C., for Public Citizen, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.
Gary S. Guzy; Robert G. Dreher; Jonathan J. Fleuchaus; Lois J. Schiffer; Washington, D.C., Jared A. Goldstein; and Anne R. Traum for the United States as Amicus Curiae on behalf of Plaintiffs and Appellants.
Borton, Petrini & Conron, Bradley A. Post and Samuel L. Phillips, Bakersfield, for Defendants and Respondents Tri-Ag Service, Inc., and Paul Osterlie.
Law Offices of James W. Rushford, Thompson, Meade, Nielsen & Rushford, Rushford & Bonotto, James W. Rushford; Sacramento, Holtzman, Urquhart & Moore, Holtzman & Urquhart, James L. Moore, Jack E. Urquhart, John W. Ghezzi; McKenna & Cuneo, Lawrence S. Ebner, R. Wicks Stephens II, Los Angeles, and J. Lane Tilson for Defendant and Respondent Bayer Corporation.
Barnes & Thornburg, Dean T. Barnhard, Indianapolis, IN.; Haight, Brown & Bonesteel and Lisa L. Oberg, San Francisco, for American Crop Protection Association, RISE, Chemical Producers and Distributors Association, Chemical Manufacturers Association, Chemical Specialties Manufacturers Association and International Sanitary Supply Association as Amici Curiae on behalf of Defendant and Respondent Bayer Corporation.
Susan Liebeler, Malibu; Holland & Hart, Elizabeth R. Jones, Denver, CO.; Daniel J. Pope, Chicago, IL.; and Paul D. Kamenar, Washington, D.C., for Washington Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.
Mayer, Brown & Piatt, Kenneth S. Geller, Alan E. Untereiner and Donald M. Falk, Washington, D.C., for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendants and Respondents.
BROWN, J.
The question presented by this case is whether state law claims for failure to warn of the risks of using a pesticide are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq. (FIFRA)).
Unlike the Court of Appeal here, the overwhelming majority of the courts that have considered this question, including eight of the federal circuit courts of appeals, have concluded that state law failure-to-warn claims are preempted by FIFRA. *38 (See, e.g., Grenier v. Vermont Log Bldgs., Inc. (1st Cir.1996) 96 F.3d 559; King v. E.I. Dupont De Nemours & Co. (1st Cir.1993) 996 F.2d 1346, cert. dism. (1993) 510 U.S. 985, 114 S.Ct. 490, 126 L.Ed.2d 440; Worm v. American Cyanamid Co. (4th Cir.1993) 5 F.3d 744; Mac-Donald v. Monsanto Co. (5th Cir.1994) 27 F.3d 1021; Kuiper v. American Cyanamid Co. (7th Cir.1997) 131 F.3d 656, cert. den. (1998) 523 U.S. 1137, 118 S.Ct. 1839, 118 S.Ct. 1839; Shaw v. Dow Brands, Inc. (7th Cir.1993) 994 F.2d 364; Bice v. Leslie's Poolmart, Inc. (8th Cir.1994) 39 F.3d 887; Taylor AG Industries v. Pure-Gr
o (9th Cir.1995) 54 F.3d 555; Arkansas-Platte & Gulf v. Van Waters & Rogers (10th Cir. 1993) 981 F.2d 1177, cert. den. (1993) 510 U.S. 813, 114 S.Ct. 60, 126 L.Ed.2d 30; Papas v. Upjohn Co. (11th Cir.1993) 985 F.2d 516, cert. den. (1993) 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248; accord, Louisiana-Pacific Corp. v. Koppers Co. (1995) 32 Cal.App.4th 599, 38 Cal.Rptr.2d 257; contra, Ferebee v. Chevron Chemical Co. (D.C.Cir.1984) 736 F.2d 1529.)
While we are not bound by decisions of the lower federal courts, even on federal questions, they are persuasive and entitled to great weight. (People v. Bradley (1969) 1 Cal.3d 80, 86, 81 Cal.Rptr. 457, 460 P.2d 129.) Where lower federal precedents are divided or lacking, state courts must necessarily make an independent determination of federal law (Rohr Aircraft Corp. v. County of San Diego (1959) 51 Cal.2d 759, 764, 336 P.2d 521, revd. without comment on this point 362 U.S. 628, 80 S.Ct. 1050, 4 L.Ed.2d 1002), but where the decisions of the lower federal courts on a federal question are "both numerous and consistent," we should hesitate to reject their authority (Conrad v. Bank of America (1996) 45 Cal.App.4th 133, 150, 53 Cal.Rptr.2d 336).
The federal court decisions holding that FIFRA preempts state law failure-to-warn claims are numerous, consistent, pragmatic and powerfully reasoned. As discussed below, we find their analysis persuasive and reverse the judgment of the Court of Appeal reaching the contrary conclusion.

FACTUAL AND PROCEDURAL BACKGROUND
Under FIFRA, all pesticides sold in the United States must be registered with the United States Environmental Protection Agency (EPA). (7 U.S.C. § 136a(a).)[1] In the registration application, manufacturers must submit draft label language addressing a number of different topics, including ingredients, directions for use (40 C.F.R. § 152.50 (1999)), and any information of which they are aware regarding "unreasonable adverse effects of the pesticide on man or the environment." (40 C.F.R. § 152.50(f)(3).) Prior to registering a pesticide, the EPA must find that its labeling complies with FIFRA's requirements. (§ 136a(c)(5)(B).) This includes the EPA's determination that the pesticide is not "misbranded." (See 40 C.F.R. § 152.112(f).) A pesticide is misbranded if, inter alia, its label "does not contain a warning or caution statement which may be necessary and ... is adequate to protect health and the environment." (§ 136(q)(G).) In addition, the EPA must find that the pesticide, when used in accordance with its labeling, "will perform its intended function without unreasonable adverse effects on the environment." (§ 136a(c)(5)(C).) "Unreasonable adverse effects on the environment" are defined as "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." (§ 136(bb).) Finally, FIFRA provides that a state "shall not impose or continue in effect any requirements for labeling ... in addition to or different from those required under this subchapter." (§ 136v(b).)
*39 Defendant Bayer Corporation (Bayer) manufactures the pesticides Guthion and Morestan, the labels of which were approved by the EPA. The label for Guthion states that application to walnuts to kill codling moths and other insects is a recommended use, with the recommended amount being three to four pounds per acre as a full coverage spray. The label for Morestan states that application to walnuts to kill aphids and mites is a recommended use, with the recommended amount being one to one-and-one-half pounds per 100 gallons of water as a full coverage spray.
Plaintiffs operate walnut orchards and purchased Guthion and Morestan from defendant Tri-Ag Service, Inc. (Tri-Ag). Defendant Paul Osterlie, a pest control adviser licensed in California and a Tri-Ag employee, recommended a combined application of Guthion and Morestan at three pounds each per treated acre, along with other materials, and water delivered in an aggregate of 125 gallons of material per acre. Plaintiffs followed Osterlie's recommendations and applied the combination of Guthion and Morestan to three orchards, resulting in approximately $150,000 damage to their walnut crop.
Plaintiffs sued Tri-Ag, Osterlie, and Bayer for negligence, strict liability for ultrahazardous activity, negligence per se, products liability, breach of implied warranty, misrepresentation, and trespass. Defendants moved for summary judgment on the ground that all of the causes of action, in effect, challenged the adequacy of the warnings on Guthion's and Morestan's EPA-approved labels, and thus were preempted by FIFRA. In two summary judgment rulings, the trial court agreed, holding that all of plaintiffs' causes of action "allege inadequate labeling in one form or another," with the "main issue being the failure of the labels to warn against mixing chemicals." In addition, the court held plaintiffs failed to produce evidence indicating a cause of action for negligence against defendants Tri-Ag and Osterlie, and as to the cause of action for misrepresentation, failed to raise a triable issue of fact as to intent to defraud on the part of defendants. The Court of Appeal reversed.

DISCUSSION
Recognizing that the overwhelming majority of the courts examining the question have concluded FIFRA preempts state law failure-to-warn claims, the Court of Appeal asked itself how "the bulk of the case law [had] gone astray." There were two answers, the court found. One was the perceived failure of the other courts to draw the correct lesson from Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 (Cipollone ), in which the Supreme Court held the Public Health Cigarette Smoking Act of 1969 preempted state law failure-to-warn actions. Specifically, the Court of Appeal argued, "the case law goes wrong in failing to consider, as the proper analogy, the preemption provision of the Cigarette Labeling and Advertising Act of 1965," which the high court held does not bar common law actions. The second was the failure of the other courts "to consider adequately" the text of the FIFRA preemption provision (§ 136v(b)) in light of the rest of the statute, particularly subdivision (a) of section 136v. The one case that got it right, in the view of the Court of Appeal, was Ferebee v. Chevron Chemical Co., supra, 736 F.2d 1529 (Ferebee).

A. Cipollone, The Preemption Provisions of The 1965 And 1969 Cigarette Acts, And The Lessons To Be Drawn for FIFRA
In Cipollone, supra, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407, the plaintiff, a woman who ultimately died of lung cancer after years of smoking, sued cigarette manufacturers under state common law for failure to warn consumers of the dangers of smoking. The manufacturers argued state law failure-to-warn actions were preempted by the Federal Cigarette Labeling *40 and Advertising Act of 1965 (Pub.L. 89-92 (July 27, 1965), 79 Stat. 282, codified at 15 U.S.C. § 1331 et seq. (the 1965 Cigarette Act)) and its successor, the Public Health Cigarette Smoking Act of 1969 (Pub.L. 91-222 (April 1, 1970), 84 Stat. 87, amending 15 U.S.C. § 1331 et seq. (the 1969 Cigarette Act)). The Supreme Court held the 1965 Cigarette Act did not bar common law claims, but the 1969 Act does. (Cipollone, supra, 505 U.S. at pp. 524-525, 530-531, 112 S.Ct. 2608.)[2]
The preemptive scope of the two acts, the high court held, was "governed entirely by the express language in § 5 of each Act." (Cipollone, supra, 505 U.S. at p. 517, 112 S.Ct. 2608.)
Section 5 of the 1965 Cigarette Act provided in part: "(a) No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package. [¶] (b) No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." (Pub.L. 89-92 (July 27, 1965), § 5, 79 Stat. 282.)
By contrast, section 5 of the 1969 Cigarette Act provides: "(b) No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act." (Pub.L. 91-222 (April 1, 1970), § 5, 84 Stat. 87.)
As the high court observed, in the preemption provision of the 1965 Cigarette Act, Congress "spoke precisely and narrowly," merely prohibiting state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels or in cigarette advertisements. (Cipollone, supra, 505 U.S. at p. 518, 112 S.Ct. 2608.)
Compared to its predecessor in the 1965 Cigarette Act, the plain language of the pre-emption provision of the 1969 Cigarette Act, the high court held, is "much broader," barring "not simply `statement[s]' but rather `requirement[s] or prohibition[s] ... imposed under State law.'" (Cipollone, supra, 505 U.S. at p. 520, 112 S.Ct. 2608.) "The phrase `[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules. As we noted in another context, `[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy.' " (Id, at p. 521, 112 S.Ct. 2608, quoting San Diego Building Trades Council v. Garmon (1959) 359 U.S. 236, 247, 79 S.Ct. 773, 3 L.Ed.2d 775.)
Like the preemption provision of the 1969 Cigarette Act, section 136v(b) of FIRA provides that a state "shall not impose or continue in effect any requirements *41 for labeling or packaging in addition to or different from those required under this subchapter." (Italics added.)
"There is no notable difference between the language in the 1969 Cigarette Act and the language in FIFRA." (Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 559.) "For this reason," the Ninth Circuit Court of Appeals noted, "seven circuits have held that § 136v(b) preempts failure to warn claims based on inadequate labeling. See Bice v. Leslie's Poolmart, Inc., 39 F.3d 887, 888 (8th Cir.1994); Mac-Donald v. Monsanto Co., 27 F.3d 1021, 1024-25 (5th Cir.1994); Worm v. American Cyanamid Co., 5 F.3d 744, 747 (4th Cir.1993) ...; King, 996 F.2d at 1349; Shaw, 994 F.2d at 371; Papas v. Upjohn Co., 985 F.2d 516, 518 (11th Cir.) ...; Arkansas-Platte & Gulf Partnership v. Van Waters & Rogers, Inc., 981 F.2d 1177, 1179 (10th Cir.)...." (54 F.3d at p. 560.)
"We believe ... the prohibition of `any' requirement is the functional equivalent of `no' requirement. We see no difference between the operative effect of the two acts." (Arkansas-Platte & Gulf v. Van Waters & Rogers, supra, 981 F.2d at p. 1179 [10th Cir.1993].)
"The FIFRA language prohibiting the states from `impos[ing] or continuing] in effect any requirements,' 7 U.S.C. § 136v(b), is virtually indistinguishable from the state-imposed `requirement' language that Cipollone held preempted the state common law tort claims based on inadequate warning. FIFRA's language, too, preempts the state law lack-of-warning claims involved in this case." (King v. E.I. Dupont De Nemours and Co., supra, 996 F.2d at p. 1349 [1st Cir.1993].)
"In order to succeed in the wake of Cipollone, then, Shaw would have to show that FIFRA's pre-emption language is less sweeping than the language of the 1969 Cigarette Act. Yet we can discern no significant distinction at allFIFRA says that `[s]uch State shall not impose ... any requirements for labeling or packaging in addition to or different from those required...,' while the cigarette law says `[n]o requirement[s] or prohibition[s] ... imposed under State law' shall be permitted. Both seem equally emphatic: `[n]o requirements or prohibitions' is just another way of saying a `[s]tate shall not impose ... any requirements.' Not even the most dedicated hair splitter could distinguish these statements. If common law actions cannot survive under the 1969 cigarette law, then common law actions for labeling and packaging defects cannot survive under FIFRA." (Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 371 [7th Cir.1993].)
The Court of Appeal acknowledged the weight of authority, but found the analysis flawed. "A striking omission in the postCipollone FIFRA preemption case law is the lack of any comparison of the FIFRA preemption provision and the preemption provision in the 1965 Act." We disagree. Cipollone emphasized that "the pre-emptive scope of the 1965 Act and the 1969 Act is governed entirely by the express language in § 5 of each Act." (505 U.S. at p. 517, 112 S.Ct. 2608.) The circuit courts analyzed the FIFRA preemption provision in light of Cipollone. Indeed, two of them were expressly remanded in light of Cipollone. (Papas v. Upjohn Co., supra, 985 F.2d 516; Arkansas-Platte & Gulf v. Van Waters & Rogers, Inc., supra, 981 F.2d 1177.) In holding that FIFRA was functionally equivalent to the 1969 Cigarette Act, insofar as their preemption provisions were concerned, they impliedly found that it was distinguishable from the 1965 Cigarette Act.
In an attempt to show that section 136v(b) of FIFRA "is more grammatically akin" to the 1965 Cigarette Act preemption provision, the Court of Appeal "substitute[d]" the "core" of the 1965 and 1969 Cigarette Acts' preemption provisions "into the format" of section 136v(b), thereby literally rewriting the text of section 136v(b). Furthermore, the "substitution of `requirements' for `required'" to demonstrate that the 1965 Cigarette Act provision *42 is a cognate of section 136v(b) is inconsistent with the Supreme Court's own comparison of the 1965 and 1969 provisions. As we have noted above, the Supreme Court explained that the 1965 Cigarette Act "bars ... simply `statements'" whereas the 1969 Cigarette Act's provision is "much broader" and bars "`requirements] ... imposed under State law.'" (Cipollone, supra, 505 U.S. at p. 520, 112 S.Ct. 2608, italics added.) Thus, the Supreme Court drew the very distinction between the 1965 and 1969 Cigarette Acts that the Court of Appeal seeks to explain away in its effort to prove that all of the other courts are guilty of a "striking omission. "

B. Ferebee And Subdivision (a) of Section 136v
As previously mentioned, the one case that got it right, in the view of the Court of Appeal, was a pre-Cipollone caseFerebee, supra, 736 F.2d 1529. The gist of the argument made in Ferebee was that a state's freedom under section 136v(a) to ban a pesticide outright presupposes the freedom to control the use of that pesticide by imposing tort liability on the manufacturer "for injuries that could have been prevented by a more adequate label." (736 F.2d at p. 1541.)
"While FIFRA does not allow states directly to impose additional labelling requirements, the Act clearly allows states to impose more stringent constraints on the use of EPA-approved pesticides than those imposed by the EPA: `A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.' 7 U.S.C. § 136v(a). See also Sen.Rep. No. 838 92d Cong., 2d Sess. 30 (1982) [sic: 1972] reprinted in 1972 U.S.Code Cong. & Admin. News 4021 (`Generally, the intent of the provision is to leave to the States the authority to impose stricter regulation on pesticides uses than that required under the Act.') [citations]. Given this provision, Maryland might well have the power to ban paraquat entirely. We need not decide that issue, however, to hold that, if a state chooses to restrict pesticide use by requiring that the manufacturer compensate for all injuries or for some of these injuries resulting from use of a pesticide, federal law stands as no barrier." (Ferebee, supra, 736 F.2d at p. 1541.)
Reliance upon Ferebee is misplaced because it is no longer good law. (See, e.g., Louisiana-Pacific Corp. v. Koppers Co., supra, 32 Cal.App.4th at p. 608, 38 Cal. Rptr.2d 257 [explaining that Ferebee "predates Cipollone and ... is no longer good law"]; Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 370 [concluding that Ferebee's theory that damages do not impose "requirements" within the meaning of section 136v(b) "evaporated" when the Supreme Court decided Cipollone ].) Although the District of Columbia Circuit has not expressly overruled Ferebee, it has expressly acknowledged that Cipollone repudiated its central premise by "explaining that damage actions can be used to enforce state regulations as effectively as other forms of preventive relief and thus damage actions must be preempted where positive enactments are preempted...." (Waterview Management Co. v. F.D.I.C. (D.C.Cir. 1997) 105 F.3d 696, 699 [summarizing Cipollone's holding].)
Ferebee's fundamental thesisthat liability under state law for failure to warn is not a requirement for labeling or packaging different from that required under FIFRA has been rejected by the federal courts since Cipollone as "sophistry" and "silly," and the attempted distinction has been characterized as "illusory."
"The MacDonalds argue ... that state common law tort judgments are not `requirements': the liable party is not `required' to change his label by a damage award, the argument goes, but may simply pay the judgment and leave the label as it is. We think this argument is sophistry. If plaintiffs could recover large damage awards because the herbicide was improperly *43 labeled under state law, the undeniable practical effect would be that state law requires additional labeling standards not mandated by FIFRA." (MacDonald v. Monsanto Co., supra, 27 F.3d at p. 1025.)
"Shaw's argument is appealing because, unlike federal regulations which firms are required to follow, common law duties may be simply ignored by defendants.... On the other hand, damages actions, just like regulatory mandates, cause companies to modify their economic decisions. It would be silly to pretend that federal lawmakers, seeking to occupy a whole field of regulation, wouldn't also be concerned about the distorting effects of tort actions." (Shaw v. Dow Brands, Inc., supra, 994 F.2d at p. 370.)
"The Worms' argument that their state law claims are based on duties not inconsistent with those imposed by FIFRA has no merit. Because the language on the label was determined by the EPA to comply with the federal standards, to argue that the warnings on the label are inadequate is to seek to hold the label to a standard different from the federal one. Nor does it make any difference that the standard the Worms seek to apply is one imposed by the common law rather than by positive legislative or executive enactment. Any distinction between the two is `illusory.'" (Worm v. American Cyanamid Co., supra, 5 F.3d at p. 748.)
When Congress intends to preempt state regulatory authority but to leave common law actions intact, it knows how to accomplish that. An example is found in the Comprehensive Smokeless Tobacco Health Education Act of 1986, 15 United States Code section 4401 et seq. Section 4406(b) of title 15 of the United States Code preempts "any State or local statute or regulation" regarding labeling or advertising, except billboards, while section 4406(c) provides that "[n]othing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person."
Furthermore, the United States Supreme Court recently reaffirmed the fundamental principle that savings clauses generally should not be interpreted in such a way as to undercut or dilute an express preemption clause. "`Th[e savings] clause ... cannot in reason be construed as continuing in [customers] a common law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself.'" (AT. & T. v. Central Office Telephone, Inc. (1998) 524 U.S. 214, 227-228, 118 S.Ct. 1956, 1965, 141 L.Ed.2d 222, quoting Texas & Pacific R. Co. v. Abilene Cotton Oil Co. (1907) 204 U.S. 426, 446, 27 S.Ct. 350, 51 L.Ed. 553, italics added.)

C. Medtronic Inc. v. Lohr (1996) 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700
Although the Court of Appeal does not mention Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (Medtronic), plaintiffs contend that under its reasoning "common law tort claims involving a `failure to warn' of the dangers of a pesticide are no longer preempted at all."
Medtronic does not undermine the conclusion that FIFRA preempts state failure-to-warn claims. The overwhelming majority of the courts that have examined the question have so held. (See Lescs v. William R. Hughes, Inc. (4th Cir. Jan. 4, 1999, No. 97-2278) 1999 WL 12913; Grenier v. Vermont Log Bldgs., Inc., supra, 96 F.3d 559; Oliver v. Reckitt & Colman, Inc. (M.D.Fla.1998) 12 F.Supp.2d 1287; Hawkins v. Leslie's Poolmart (D.N.J.1997) 965 F.Supp. 566; Kuiper v. American Cyanamid Co. (E.D.Wis.1997) 960 F.Supp. 1378; Koch v. Shell Oil Co. (D.Kan.1997) 173 F.R.D. 288; Ackerman v. American Cyanamid Co. (Iowa 1998) 586 N.W.2d 208; Ackles v. Luttrell (1997) 252 Neb. 273, 561 N.W.2d 573, cert. den. (1997) 522 U.S. 928, 118 S.Ct. 329, 139 L.Ed.2d 255; Didier v. Drexel Chemical Co. (1997) 86 Wash.App. 795, 938 P.2d 364; Lewis v. *44 American Cyanamid Co. (1998) 155 N.J. 544, 715 A.2d 967; Sherman v. Claire Manufacturing Co. (N.Y.App.Div.1997) 239 A.D.2d 487, 657 N.Y.S.2d 453.)
In Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, the high court construed the preemption provision of the Medical Device Amendments of 1976. (21 U.S.C. § 360k(a)(MDA).) Section 360k(a) of title 21 of the United States Code provides that "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter."
The manufacturer argued, in essence, that "the plain language of the statute preempts any and all common law claims brought by an injured plaintiff against a manufacturer of medical devices." (Medtronic, supra, 518 U.S. at p. 486, 116 S.Ct. 2240.) Rejecting this "sweeping" interpretation of the statute, the plurality opinion held that "§ 360(k) simply was not intended to pre-empt most, let alone all, general common law duties enforced by damages actions." (518 U.S. at p. 491, 116 S.Ct. 2240.)
Medtronic is distinguishable on the ground Congress gave the federal Food and Drug Administration (FDA) a unique role in determining the scope of preemption under the MDA. "Unlike the statute construed in Cipollone, for instance, preemption under the MDA does not arise directly as a result of the enactment of the statute; rather, in most cases a state law will be pre-empted only to the extent that the FDA has promulgated a relevant federal `requirement.' ... Congress explicitly delegated to the FDA the authority to exempt state regulations from the preemptive effect of the MDAan authority that necessarily requires the FDA to assess the pre-emptive effect that the Act and its own regulations will have on state laws.... The ambiguity in the statute and the congressional grant of authority to the agency on the matter contained within itprovide a `sound basis,' ... for giving substantial weight to the agency's view of the statute.... [¶] The regulations promulgated by the FDA expressly support the conclusion that § 360k `does not preempt State or local requirements that are equal to, or substantially identical to, requirements imposed by or under the act.'" (Medtronic, supra, 518 U.S. at pp. 496-497, 116 S.Ct. 2240 (plur. opn. of Stevens, J.); see also id. at p. 506, 116 S.Ct. 2240 (cone. opn. of Breyer, J.) [emphasizing the FDA's exercise of "its explicitly designated power to exempt state requirements from pre-emption"].)
Congress did not give the EPA an analogous role in implementing FIFRA. (See Oliver v. Reckitt & Colman, Inc., supra, 12 F.Supp.2d at p. 1291 ["[T]he Court's decision in Medtronic was influenced by the authority given to the FDA, an authority not given to the EPA."]; Kuiper v. American Cyanamid Co., supra, 960 F.Supp. at p. 1384 ["FIFRA does not have a corresponding federal regulation which limits its preemptive effect.... Such a regulation, along with the MDA's particular statutory language, was critical to the Court's opinion in Medtronic."].)

D. The EPA's Waiver of Submission of Efficacy Data in Registering Pesticides
After we granted review, the United States filed an amicus curiae brief on behalf of plaintiffs. Even though the question presented in this case has been addressed by nine of the federal circuit courts of appeals, the United States failed to file amicus curiae briefs in any of the cases and permitted those courts to proceed upon a fundamental assumption that it now characterizes as mistaken.
According to the EPA, the courts that have reached the conclusion that FIFRA preempts state failure-to-warn claims have *45 done so under the mistaken impression that FIFRA regulates all aspects of pesticide labeling. In fact, with congressional approval, the EPA concerns itself only with whether a pesticide would have unreasonably adverse effects on human health or the natural environment. In initially registering a pesticide, the EPA does not address the question whether it will control the target pest or harm the crop it was intended to protectthe claim made here. Those are questions of pesticide efficacy. Congress gave the EPA authority to waive the review of pesticide efficacy claims, and the EPA has exercised this authority, leaving it to the marketplace and the prospect of tort liability to fill the gap. Therefore, the maintenance of state failure-to-warn claims, the United States argues, is entirely consistent with FIFRA as it is actually administered by the EPA.
The factual support for the foregoing characterization of the pesticide registration and label approval process, the United States submits, is supplied by a document issued by the EPA's Office of Pesticides Programs, Pesticide Regulation (PR) Notice 96 (June 3, 1996). Notice will be taken of PR Notice 96-4 as an "official act" of the federal government within the meaning of Evidence Code section 452, subdivision (c). (See Empire Properties v. County of Los Angeles (1996) 44 Cal.App.4th 781, 788, fn. 2, 52 Cal. Rptr.2d 69 [notice taken of report of task force commissioned by the Legislature]; San Mateo County Coastal Landowners'1 Assn. v. County of San Mateo (1995) 38 Cal.App.4th 523, 552-553, 45 Cal.Rptr.2d 117 [trial court properly took notice of letter from the Secretary of Resources to the Executive Director of the California Coastal Commission]; People v. Goodloe (1995) 37 Cal.App.4th 485, 493-494, 44 Cal. Rptr.2d 15 [notice taken of Department of Corrections' administrative bulletin].)
The gravamen of PR Notice 96-4 is that the courts reaching the conclusion that FIFRA preempts state failure-to-warn claims have done so under the mistaken impression that the EPA evaluates efficacy in the initial pesticide registration and label approval process. However, plaintiffs do not claim the pesticides they used were inefficacious, i.e., that they failed to control the target pests. Rather, they claim they should have been warned that the combined use of these pesticides could be phytotoxic, i.e., that they might damage the crop they were intended to protect. ("This warning, that Morestan when combined with [Guthion] produces some phytotoxicity is totally missing from the label restrictions.") As defendants point out, the EPA's testing guidelines appear to make it clear that phytotoxicity and efficacy are distinct concepts and that, contrary to the implications of PR Notice 96-4 and assertions made in the briefs of plaintiffs and the United States, the former concept is not included in the latter.
The EPA's testing guidelines for assessing a pesticide's potential hazards to "nontarget plants," e.g., crops, define phytotoxicity as follows: "The term `phytotoxicity' or `plant toxicity' means unwanted detrimental deviations from the normal pattern of appearance, growth, and function of plants in response to pesticides and to other toxic chemicals that may be applied with the pesticide." (EPA, Pesticide Assessment Guidelines, subd. J, Hazard Evaluation: Non-Target Plants (Oct.1982) § 120-2, p. 18.)
A separate set of guidelines for assessing a pesticide product's performance states that "[t]he term `effectiveness' ... is synonymous with the term `efficacy,'" and defines "`effectiveness'" as follows: "The term `effectiveness' refers to a product's ability to control the specific target pest ... when the product is applied in accordance with the label directions, precautions, and limitations of use." (EPA, Pesticide Assessment Guidelines, subd. G: Product Performance (Nov. 1982) § 90-2(b), p. 36.)
The claim made in PR Notice 96-4 that the EPA does not concern itself with questions of efficacy in the initial pesticide *46 registration and label approval processis thus beside the point. Phytotoxicity is not a matter of efficacy, and it is phytotoxicity of which plaintiffs complain. Nevertheless, we will proceed to consider the argument the United States makes on the basis of PR Notice 96-4, which may be summarized as follows: The 1972 amendments to FIFRA required the EPA to evaluate all claims of pesticide efficacy. (§ 136a(c)(5)(A).) However, as the House Agriculture Committee observed, the pesticide approval process then ground to "a virtual halt." (H.R.Rep. No. 95-663, 1st Sess., p. 18 (1977) reprinted in 1978 U.S.Code Cong. & Admin. News at p. 1991.) In an effort to streamline the process, Congress amended FIFRA in 1978 to permit the EPA to waive review of pesticide efficacy claims. (7 U.S.C. 136a(c)(5).) The EPA issued such a waiver (40 C.F.R. §§ 158.640(b), 158.540 (1999)), explaining that it would enable the agency to focus on its "primary mandate under FIFRA ... the health and safety aspects of pesticides" (47 Fed.Reg. 53192, 53196 (Nov. 24, 1982)). Because the EPA does not review efficacy claims, the United States asserts, "preemption of state damages actions challenging pesticide efficacy would leave such statements largely, or entirely, unregulated."
Again, the short answer to this argument is that the EPA's waiver of the submission of efficacy data is irrelevant, since plaintiffs complain of phytotoxicity, not inefficacy. However, even assuming arguendo that phytotoxicity is included within the concept of efficacy, there remain two fundamental flaws in the argument that pesticide efficacy will go "largely, or entirely, unregulated" if state failure-to-warn claims are preempted: (1) Although the EPA has waived the submission of efficacy data for agricultural pesticides at the time of their initial registration, the agency does require and review such data if efficacy-related problems develop later; and (2) California has a comprehensive registration and regulatory program for pesticides, and while the California Department of Pesticide Regulation may not impose its own requirements for labeling, it can restrict or prohibit the sale or use of products that it determines are inefficacious or phytotoxic. (See § 136v(a).)

1. The EPA's postregistration consideration of efficacy
Before granting registration, the EPA is required by FIFRA to determine whether a pesticide "will perform its intended function without unreasonable adverse effects on the environment" (§ 136a(c)(5)(C)), which means "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use" of the pesticide (§ 136(bb)). The term "environment" is defined to include "all plants" (§ 136(j)), and this definition includes crops (see Kuiper v. American Cyanamid Co., supra, 131 F.3d at p. 664).
The 1978 amendment to FIFRA allows the EPA, "[i]n considering an application for the registration of a pesticide [to] waive data requirements pertaining to efficacy." (§ 136a(c)(5).) However, in promulgating the waiver, the EPA emphasized that in the event that efficacy-related problems developed after a pesticide was registered, the agency would require and review such data. "The Administrator reserves the right to request submission of efficacy data in support of label claims for any registered product. A request may be made for any product for which a pattern of inadequate performance has been reported." (44 Fed.Reg. 27932, 27939 (May 11, 1979); see 40 C.F.R. § 158.640(b) [EPA "reserves the right to require, on a case-by-case basis, submission of efficacy data for any pesticide product registered or proposed for registration."].) Along the same lines, the EPA subsequently explained that without "initial product performance data, the Agency is compelled to monitor more closely the content of use directions on labels.... If a pattern of inaccurate, outdated, or ambiguous use directions is determined to be a major problem, *47 the Agency will require the submission of efficacy data." (49 Fed.Reg. 37960-37961 (Sept. 26,1984).)
The EPA's recent adverse effects reporting rule (§ 136d(a)(2)) requires pesticide manufacturers to submit "toxic or adverse effect incident reports," specifically including data concerning "alleged effect[s] involving] damage to plants." (40 C.F.R. § 159.184(c)(5)(iv) (1999).) Significantly, the regulation provides that information need not be reported for an "incident" which "concerns non-lethal phytotoxicity to the treated crop if the label provides an adequate notice of such a risk." (40 C.F.R. § 159.184(b)(4), italics added.) Moreover, upon receiving crop damage reports under the adverse effects reporting rule, the agency's regulatory options are not limited to cancellation; it can also require labeling changes. The EPA explained when it promulgated the rule that, "[w]hile reportable information under section 6(a)(2) could conceivably result in cancellation ... action, this information could also be used by the Agency in other ways. The information could suggest the need for modification to the terms and conditions of registration which could be necessitated by the balancing of the risks and benefits associated with a particular pesticide." (42 Fed.Reg. 49370, 49372 (Sept. 19, 1997).)

2. California's regulatory program
Congress, the United States asserts, did not intend to leave pesticide efficacy unregulated. "On the contrary, Congress specifically sanctioned state regulation of pesticide efficacy."
FIFRA clearly does contemplate a state/federal partnership in the regulation of pesticide efficacy and phytotoxicity. Section 136v(a) provides that a "State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." This does not mean, however, that the regulation may be accomplished through the back door by means of tort suits that effectively require changes in EPA-approved labeling.
California requires that pesticide manufacturers and their products be registered with the Department of Pesticide Regulation. (Food & Agr.Code, §§ 12811, 12993.) The code requires that a comprehensive risk/benefit analysis be undertaken in the public interest when the department considers whether a product should be registered in the first instance or whether its registration should be canceled. (Food & Agr.Code, §§ 12824, 12825; see also Cal. Code Regs., tit. 3, § 6158.) With regard to the specific claim made in this case, the department may require data on "[p]hytotoxicity" and "[t]he effect from the use of mixtures of two or more products in combination." (Cal.Code Regs, tit. 3, § 6192, subds. (b), (e).) To ensure that California's agriculture is protected from unforeseen or newly discovered risks, the director is charged with the responsibility for the "continuous evaluation of all registered products." (Cal.Code Regs, tit. 3, § 6226.) As part of this continuous evaluation, the director must make administrative determinations regarding precisely the issue raised by this case"[u]ndesirable phytotoxicity." (Cal.Code Regs, tit. 3, § 6221, subd. (f).)
Given the comprehensive and stringent character of California's program of pesticide regulation, having lay juries assess questions of phytotoxicity in the context of failure-to-warn claims is neither necessary nor desirable, and holding that such actions are preempted by FIFRA promotes federalism, rather than undermines it.

E. Determining Whether Particular Causes of Action Are Preempted under FIFRA
Having concluded that FIFRA preempts state law claims for failure to warn of the risks of using a pesticide, we now turn to the question whether plaintiffs' claims can fairly be so characterized. (See Cipollone, supra, 505 U.S. at p. 523, 112 S.Ct. 2608 ["we must look to each of petitioner's common-law *48 claims to determine whether it is in fact pre-empted" (fn. omitted)].)
In determining whether specific claims are preempted by the 1969 Cigarette Act, "[t]he central inquiry in each case," the high court said, is "straightforward." (Cipollone, supra, 505 U.S. at pp. 523-524, 112 S.Ct. 2608.) "[W]e ask whether the legal duty that is the predicate of the common-law damages action constitutes a `requirement or prohibition based on smoking and health ... imposed under State law with respect to ... advertising or promotion,' giving that clause a fair but narrow reading." (Id. at p. 524, 112 S.Ct. 2608.)
"In this case," Cipollone continued, "petitioner offered two closely related theories concerning the failure to warn: first, that respondents `were negligent in the manner [that] they tested, researched, sold, promoted, and advertised' their cigarettes; and second, that respondents failed to provide `adequate warnings of the health consequences of cigarette smoking.' [¶] Petitioner's claims are pre-empted to the extent that they rely on a state-law `requirement or prohibition ... with respect to ... advertising or promotion.' Thus, insofar as claims under either failure-to-warn theory require a showing that respondents' post-1969 advertising or promotions should have included additional, or more clearly stated, warnings, those claims are pre-empted. The Act does not, however, pre-empt petitioner's claims that rely solely on respondents' testing or research practices or other actions unrelated to advertising or promotion." (Cipollone, supra, 505 U.S. at pp. 524-525, 112 S.Ct. 2608.) The court went on to consider petitioner's other causes of action, summarizing its holding as follows: "[T]he 1969 Act pre-empts petitioner's claims based on a failure to warn and the neutralization of federally mandated warnings to the extent that those claims rely on omissions or inclusions in respondents' advertising or promotions; the 1969 Act does not preempt petitioner's claims based on express warranty, intentional fraud and misrepresentation, or conspiracy." (Id. at pp. 530-531, 112 S.Ct. 2608.)
In determining whether particular causes of action are preempted under FFRA, "[w]e can do no better than to adapt the United States Supreme Court's approach in Cipollone: the central inquiry in each case is whether the legal duty that is the predicate of the common law damages action constitutes a State `requirement[ ] for labeling or packaging in addition to or different from' the FIFRA requirements, giving that clause a fair but narrow reading. 7 U.S.C. § 136v(b); Cipollone, at ___, 112 S.Ct. at 2621." (Hue v. Farmboy Spray Co., Inc. (1995) 127 Wash.2d 67, 896 P.2d 682, 692.)
When a claim, however couched, boils down to an assertion that a pesticide's label failed to warn of the damage plaintiff allegedly suffered, the claim is preempted by FIFRA. (See Andrus v. AgrEvo USA Co. (1999) 178 F.3d 395, 399 [implied warranty]; Kuiper v. American Cyanamid Co., supra, 131 F.3d 656, 666 [negligent off-label misrepresentations]; Grenier v. Vermont Log Bldgs., Inc., supra, 96 F.3d at pp. 563-565 [negligence, express and implied warranty, and negligent design and manufacture]; Welchert v. American Cyanamid, Inc. (8th Cir.1995) 59 F.3d 69, 72-73 [express warranty]; Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 562 [negligent testing]; Papas v. Upjohn Co., supra, 985 F.2d at p. 518 [negligence, strict liability, and implied warranty].)
On the other hand, courts have rejected preemption challenges with regard to a wide variety of claims where they did not implicate requirements for labeling or packaging different from those required by FIFRA. (See Burt v. Fumigation Service and Supply, Inc. (W.D.Mich.1996) 926 F.Supp. 624, 631 [negligent design]; Reutzel v. Spartan Chemical Co. (N.D.Iowa 1995) 903 F.Supp. 1272, 1281-1282 [strict liability for defective design and manufacture]; *49 Arkansas-Platte & Gulf Partnership v. Dow Chemical Co. (D.Colo.1995) 886 F.Supp. 762, 767-768 [strict liability for defective design and manufacture and negligent design and manufacture]; Riggins v. Monsanto Co. (N.D.N.Y.1994) 862 F.Supp. 751, 757-761 [negligent testing, strict liability for defective design, and express warranty]; Jillson v. Vermont Log Bldgs., Inc. (D.Mass.1994) 857 F.Supp. 985, 990-992 [express warranty and negligent design and manufacture]; Bingham v. Terminix Intern., Co., L.P. (S.D.Miss. 1994) 850 F.Supp. 516, 521-522 [negligent testing and inspection, strict liability, and implied warranty]; Ackerman v. American Cyanamid Co., supra, 586 N.W.2d at pp. 214-215 [negligent design and testing]; McAlpine v. Rhone-Poulenc Ag. Co. (1997) 285 Mont. 224, 947 P.2d 474, 478-479 [express warranty, implied warranty, and strict liability for defective design and manufacture].)
We turn now to the causes of action tendered by the plaintiffs in this case. In their first cause of action, plaintiffs alleged that defendant Bayer negligently manufactured, formulated, produced, packaged and tested Morestan and Guthion. They also alleged that defendants Tri-Ag and its employee Osterlie negligently recommended the application of Morestan together with Guthion at certain concentrations and with certain other products. Their other causes of action, in the order recited in the complaint, were: strict liability for ultra-hazardous activity, negligence per se for violating certain sections of the Food and Agriculture Code, product liability, breach of implied warranty, misrepresentation, and trespass.
As previously stated, defendants moved for summary judgment on the ground that all of plaintiffs' causes of action, in effect, challenged the adequacy of the warnings on Guthion's and Morestan's EPA-approved labels, and thus were preempted by FIFRA. In two summary judgment rulings, the trial court agreed, holding that all of the causes of action did "allege inadequate labeling in one form or another," with the "main issue being the failure of the labels to warn against mixing chemicals." In addition, the court held that plaintiffs failed to produce evidence indicating a cause of action for negligence against defendants Tri-Ag and Osterlie, and as to the cause of action for misrepresentation, failed to raise a triable issue of fact as to intent to defraud on the part of defendants.
Because the Court of Appeal held that state law failure-to-warn claims are not preempted by FIFRA, it did not discuss "the other points raised by the parties," in particular, defendants' contention that all of plaintiffs' causes of action were predicated upon alleged inadequacies in Guthion's and Morestan's EPA-approved labels. We remand that it may do so.
For the guidance of the Court of Appeal on remand, we address one final issuethe extent to which FIFRA preempts actions based on so-called off-label statements, that is, statements made outside of the context of labeling or packaging; for example, claims made orally or in advertising materials. The critical question is whether the off-label statements "merely repeat information in the label itself." (Kuiper v. American Cyanamid Co., supra, 131 F.3d at p. 662.) Where off-label statements address matters outside the scope of the label, an action may well lie.

DISPOSITION
The judgment of the Court of Appeal is reversed and the matter remanded for further proceedings consistent with this opinion.[3]
GEORGE, C.J, BAXTER, J, and CHIN, J, concur.
*50 Concurring and Dissenting Opinion by KENNARD, J.
I am unable to join either the majority or the dissenting opinion. I reject the dissent's conclusion that the Federal Insecticide, Fungicide, and Rodenticide Act (7 U.S.C. § 136 et seq. (FIFRA)) preempts no state law tort actions asserting failure-to-warn claims predicated upon alleged inadequacies in pesticide labels that the United States Environmental Protection Agency (EPA) has approved.
But I also reject the majority's conclusion that FIFRA preempts all such state law failure-to-warn claims. Rather, I conclude that FIFRA preempts a state law failure-to-warn claim based upon alleged inadequacies in an EPA-approved pesticide label if, but only if, a finding of inadequacy would be inconsistent with FIFRA. And, unlike the majority, I do not view the EPA's approval of a pesticide label as conclusively establishing the manufacturer's compliance with FIFRA. Because FIFRA itself requires correction of EPA-approved labels upon proof of crop damage or similar adverse effects, preemption exists only if the EPA, presented with evidence of the crop damage, has not required, and would not require, any label correction.
The provision of FIFRA at issue here reads:

"(a) In general.
"A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

"(b) Uniformity.
"Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

"(c) Additional uses.
"(1) A State may provide registration for additional uses of federally registered pesticides formulated for distribution and use within that State to meet special local needs in accord with the purposes of this subchapter and if registration for such use has not previously been denied, disapproved, or canceled by the Administrator...." (7 U.S.C. § 136v.)
In her dissenting opinion, Justice Werdegar views subdivision (b) of this provision, which prohibits states from imposing any "requirements for labeling or packaging in addition to or different from those required under this subchapter" as preempting only positive law, in the form of statutes or regulations, but not suits at common law. I disagree. Tort liability, imposed by a suit at common law, is an indirect but powerful method of regulating the contents of pesticide labels. To the extent that such regulation is inconsistent with the requirements of FIFRA, I conclude that federal law preempts it, just as it preempts inconsistent state requirements imposed by statute or regulation. Thus, I agree with the majority in rejecting a distinction between state regulation *51 by statute or regulation and state regulation by tort liability.
On the other hand, I do not agree with the majority's assumption that when the EPA has once exercised its authority under FIFRA by approving a pesticide label, the pesticide's manufacturer necessarily demonstrates full compliance with FIFRA by affixing the EPA-approved label to the product. EPA approval of a pesticide label is always provisional, subject to correction if the EPA becomes aware of information suggesting the need for different or additional warnings. (40 C.F.R. § 159.184 (1999); see maj. opn, ante, 93 Cal.Rptr.2d at pp. 46-47, 993 P.2d at pp. 375-376.) In this regard, FIFRA differs from the Public Health Cigarette Smoking Act of 1969 (15 U.S.C. § 1331 et seq.), which specifies particular language for a label warning. Accordingly, I do not agree with the majority that Cipollone v. Liggett Group, Inc. (1992) 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407, which construed the preemption provision of the Public Health Cigarette Smoking Act of 1969, is controlling or particularly helpful in construing FIFRA's preemption provision. Because FIFRA does not require any specific warning, but leaves the content of the label to be approved by the EPA, with a continuing duty of revision in response to new information, a manufacturer's use of an EPA-approved label does not establish full compliance with FIFRA.
Here, for example, plaintiffs allege that a combined application of two chemicals, each of which carried an EPA-approved label, caused significant damage to plaintiffs' walnut crop. Under FIFRA, the manufacturer of these two chemicals was required to notify the EPA of significant and unexpected crop damage resulting from combined use of its products. Upon consideration of this information, the EPA may determine that the products are "misbranded" and require that their labels be revised to caution against the combined use. The record before us does not reveal whether anyone has notified the EPA of alleged crop damage caused by the combined use of these chemicals, much less what the EPA has done in response to this information. It seems not unreasonable to assume, in the absence of other information, that if the combined use of these chemicals does cause significant crop damage, as plaintiffs have alleged but have not yet had the opportunity to prove, the EPA will, if it has not already done so, require label revision. If this assumption is correct, then allowing plaintiffs to pursue a failure-to-warn claim against the manufacturer does not conflict with FIFRA because both impose the same requirement, revision of the product labels to include appropriate warnings against combined use.
Because the Court of Appeal correctly determined, albeit for the wrong reason, that defendants have failed to establish FIFRA preemption of plaintiffs' claims, I would affirm the judgment of the Court of Appeal. Upon remand to the trial court, I would permit defendant manufacturer to attempt to establish FIFRA preemption through evidence that the EPA, after full consideration of information relevant to the allegation that combined use of its products causes crop damage, has determined that no change in the products' labels is required.
Dissenting opinion by WERDEGAR, J.
I dissent. Defendant Bayer Corporation (Bayer) manufactured and placed into the stream of our nation's commerce chemical products that it (and the other defendants) represented were effective in destroying certain insect pests. Plaintiffs believed these assurances and applied the product to their orchards, allegedly causing thousands of dollars worth of damage. Plaintiffs then sought compensation for this damage to their property under legal doctrines long established in this state. In concluding plaintiffs are no longer entitled to seek this relief in our courts due to the asserted preemptive effect of federal legislation, the majority discerns an expression *52 of congressional intent to deprive plaintiffs of their historic legal remedies that I do not perceive. In so doing, the majority not only misapplies the latest United States Supreme Court decision in this area of the law, but, more importantly, fails to heed the most basic and important rule governing questions of federal preemption of state law: when Congress intends to displace state law, it must express that intent clearly. Finding no such clear statement of congressional purpose, I conclude state tort law is not preempted in this case. Because the majority finds otherwise, I dissent.

I
Plaintiffs, owners of commercial walnut orchards, sought to use a pesticide to protect their crop against insect pests. They spoke to defendant Paul Osterlie, an employee of defendant Tri-Ag Service, Inc., who recommended the combined application of Guthion and Morestan mixed in water in certain proportions. Guthion and Morestan are insecticides manufactured by defendant Bayer. Because the insecticides did not dissolve well in water, Osterlie recommended that a chemical surfactant be added to the mixture to facilitate solubility (to permit the mixture to be sprayed on the trees). Plaintiffs followed Osterlie's recommendations, allegedly resulting in $150,000 damage to their walnut crop. Plaintiffs allege the chemical surfactant, alone or in combination with the insecticides, tended to dissolve the waxy surface of the leaves, causing them to wither.[1]
Plaintiffs sued Osterlie, Tri-Ag Service, Inc., and Bayer, alleging: (1) negligence; (2) strict liability for ultrahazardous activity; (3) negligence per se; (4) products liability; (5) breach of implied warranty; (6) misrepresentation; and (7) trespass. Defendants moved for summary judgment, claiming (among other things) that all causes of action were preempted by the Federal Insecticide, Fungicide and Rodenticide Act, 7 United States Code section 136 et seq. (hereafter FIFRA). The trial court agreed and granted summary judgment. In a split decision, the Court of Appeal reversed.

II
I begin with the basic rules governing questions of preemption. Of course, where state law directly conflicts with federal law, the federal law controls, for "the laws of the United States ... shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) Because we are concerned in this case with an express preemption provision (7 U.S.C. § 136v(b)), we may assume Congress intended to preempt some state law. Our task, then, is to determine the scope of that preemption. "Although our analysis of the scope of the pre-emption statute must begin with its text, see Gade v. National Solid Wastes Management Assn., 505 U.S. 88, 111, 112 S.Ct. 2374, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring in part and concurring in judgment), our interpretation of that language does not occur in a contextual vacuum. Rather that interpretation is informed by two presumptions about the nature of pre-emption." (Medtronic, Inc. v. Lohr (1996) 518 U.S. 470, 484-485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (Medtronic))
First, and most importantly, proper appreciation of the states as independent sovereigns in our federal system demands that we presume Congress did not intend to displace the historic police powers of the states unless such intent is both "clear and manifest." (Rice v. Santa Fe Elevator Corp. (1947) 331 U.S. 218, 230, 67 S.Ct. 1146, 91 L.Ed. 1447, quoted in Cipollone v. *53 Liggett Group, Inc. (1992) 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (Cipollone).) The United States Supreme Court has "long presumed that Congress does not cavalierly pre-empt state-law causes of action" (Medtronic, supra, 518 U.S. at p. 485, 116 S.Ct. 2240), stating that "we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law. [Citation.]" (New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co. (1995) 514 U.S. 645, 654-655, 115 S.Ct. 1671, 131 L.Ed.2d 695.)
This presumption against preemption acknowledges the role states historically have played, exercising their police powers to protect the health and safety of their residents. Because the federal government is a relative latecomer in the area of protecting public safety, courts should be cautious in concluding federal law supplants state law, lest the public be left without protection in matters of health and safety. We recently have recognized this rebuttable presumption against federal preemption of state law. (Peatros v. Bank of America (2000) 22 Cal.4th 147, 157, 91 Cal.Rptr.2d 659, 990 P.2d 539 (plur.opn.); Smiley v. Citibank (1995) 11 Cal.4th 138, 148, 44 Cal.Rptr.2d 441, 900 P.2d 690, affd. (1996) 517 U.S. 735, 116 S.Ct. 1730, 135 L.Ed.2d 25.)
The United States Supreme Court, moreover, has recently applied this presumption against preemption in the context of interpreting FIFRA, concluding that congressional intent to supplant state and local regulatory authority was not sufficiently "clear and manifest" in FIFRA to justify a finding of preemption. (Wisconsin Public Intervenor v. Mortier (1991) 501 U.S. 597, 607, 611, 111 S.Ct. 2476, 115 L.Ed.2d 532 (Mortier) [FIFRA does not preempt regulation of pesticides by town ordinance].) Similarly, we also have applied the presumption against preemption when interpreting FIFRA, noting that "in the absence of a clear manifestation of intention to preclude state regulation in an area traditionally regulated by the exercise of state ... police powers, it will not be presumed that a federal statute was intended to supersede such powers." (People ex rel. Deukmejian v. County of Mendocino (1984) 36 Cal.3d 476, 492, 204 Cal. Rptr. 897, 683 P.2d 1150 [FIFRA does not preclude states from authorizing local governmental entities to enact and enforce restrictive pesticide regulations].)
The second presumption or rule we must apply is that the question of preemption "fundamentally is a question of congressional intent." (English v. General Electric Co. (1990) 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65, quoted in Smiley v. Citibank, supra, 11 Cal.4th at p. 147, 44 Cal.Rptr.2d 441, 900 P.2d 690.) "`[T]he purpose of Congress is the ultimate touchstone' in every pre-emption case." (Medtronic, supra, 518 U.S. at p. 485, 116 S.Ct. 2240, quoting Retail Clerks v. Schermerhorn (1963) 375 U.S. 96, 103, 84 S.Ct. 219, 11 L.Ed.2d 179; see also Cipollone, supra, 505 U.S. at p. 516, 112 S.Ct 2608.) "Congress' intent ... primarily is discerned from the language of the pre-emption statute and the `statutory framework' surrounding it. [Citation.] Also relevant, however, is the `structure and purpose of the statute as a whole,' [citation], as revealed not only in the text, but through the reviewing court's reasone
d understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (Medtronic, supra, 518 U.S. at p. 486, 116 S.Ct. 2240.) We recently have recognized the primacy of Congress's intent when deciding preemption questions. (Peatros v. Bank of America, supra, 22 Cal.4th at p. 157, 91 Cal.Rptr.2d 659, 990 P.2d 539 (plur.opn.); Smiley v. Citibank, supra, 11 Cal.4th at p. 147, 44 Cal.Rptr.2d 441, 900 P.2d 690.)
With this basic interpretive framework in mind, I turn to whether FIFRA *54 preempts state common law causes of action.

III
The FIFRA preemption provision, 7 United States Code section 136v(b) (hereafter section 136v(b)), provides: "[A] State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter." We choose in this case between two competing interpretations of the word "requirements," as used in the statutory preemption provision. On the one hand, "requirements" could mean only positive enactments of law, such as statutes enacted by our Legislature and administrative regulations promulgated by an appropriate state agency. On the other hand, the word "requirements" could encompass both positive enactments of law as well as common law tort actions based on a failure to warn, on the theory that such actions constitute "requirements for labeling." The majority adopts this latter interpretation. As I explain, it is mistaken.
To begin with, either meaning admittedly is possible. A "requirement[ ] for labeling or packaging" most certainly includes all positive enactments of law, but it could also include common law claims for damages, the success of which could have the indirect effect of encouraging manufacturers to alter their labeling or packaging and thus allow the state to indirectly regulate labeling. The pertinent inquiry is whether the words of section 136v(b) clearly embrace the latter, broader interpretation. To that, one would have to answer in the negative. At best, FIFRA's preemption provision is ambiguous. Such ambiguity weighs in favor of interpreting section 136v(b) to have a narrow, rather than a broad, preemptive effect. (See Medtronic, supra, 518 U.S. at p. 489, 116 S.Ct. 2240 (plur. opn. of Stevens, J.) [because of "ambiguities in the statute," the Medical Devices Amendments of 1976 (MDA) should be interpreted as not preempting state law]; id. at p. 505, 116 S.Ct. 2240 (cone. opn. of Breyer, J.) [that the MDA's preemption provision "is highly ambiguous" is a factor against preemption].) To reiterate, the presumption is against preemption, and Congress's intent to supplant state law must be "clear and manifest." (Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at p. 230, 67 S.Ct. 1146.)
The majority responds that "[w]hen Congress intends to preempt state regulatory authority but to leave common law actions intact, it knows how to accomplish that," citing language in the Comprehensive Smokeless Tobacco Health Education Act of 1986 providing that "[n]othing in this chapter shall relieve any person from liability at common law or under State statutory law to any other person." (Maj. opn., ante, 93 Cal.Rptr.2d at p. 43, 993 P.2d at p. 372, quoting 15 U.S.C. § 4406(c), italics added.) The majority thus suggests that because FIFRA does not expressly leave state tort law intact, we should infer Congress intended to override it. Such reasoning is flawed for two reasons. First, its premisethat Congress would have expressly left state tort law intact if that had been its intentis not necessarily true. Rather, Congress expresses its intent in various ways. For example, Congress sometimes indicates its preemptive intent not by silence, as the majority would have it, but by expressly stating a federal law will override a state's common law. (See, e.g., 12 U.S.C. § 1715z-17(d) [providing that rules for certain mortgage insurance "shall not be subject to any State constitution, statute, court decree, common law, rule, or public policy limiting or prohibiting increases in the outstanding loan balance after execution of the mortgage" (italics added)].) That we may draw much meaning from Congress's failure to mention state tort law in section 136v(b) is therefore doubtful.
A second and more basic flaw in the majority's reasoning is that it ignores the fundamental rule governing preemption of state law. To reiterate, the presumption is *55 against preemption, and Congress's intent to supplant state law must be "clear and manifest." (Rice v. Santa Fe Elevator Corp., supra, 331 U.S. at p. 230, 67 S.Ct. 1146.) Any attempt to infer Congress's intent from its statutory silence is thus improper. (See Mortier, supra, 501 U.S. at p. 607, 111 S.Ct. 2476 [noting, in a FIFRA case, that "Mere silence ... cannot suffice to establish a `clear and manifest purpose' to pre-empt local authority"].)
More profitable than attempting to divine Congress's intent from its silence is to examine what Congress actually has said. Returning to the actual words of FIFRA, we find that Congress has supplied some affirmative indication of its intent regarding the scope of FIFRA's preemption. The statutory provision immediately preceding FIFRA's preemption provision states: "A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter." (7 U.S.C. § 136v(a), hereafter section 136v(a).) Thus, short of permitting the sale of a substance FIFRA has banned, Congress has affirmatively and specifically preserved the power of the states to regulate pesticides. Indeed, our high court has held that FIFRA "leaves ample room for States and localities to supplement federal [regulatory] efforts even absent the express regulatory authorization of § 136v(a)." (Mortier, supra, 501 U.S. at p. 613, 111 S.Ct. 2476.)
Because Congress, in the statutory provision immediately preceding the preemption provision, expressly affirmed the power of the states to regulate pesticides, to view FIFRA as an overarching federal regulatory scheme intended to supplant all or even most state regulation is inaccurate. Instead, its goals are more modest. (See Mortier, supra, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532 [FIFRA held not to preempt pesticide regulation by local town, because language of FIFRA does not explicitly preempt local regulation, Congress's intent is ambiguous, and FIFRA language shows no clear and manifest indication of congressional intent to preempt].) Reading FIFRA's preemption clause in conjunction with section 136v(a) reveals Congress's intent that the scope of FFRA's preemption of state law should be limited in nature. The majority's failure to appreciate the significance of section 136v(a) as a critical indicator of Congress's intent thus undercuts its analysis.
The majority, adopting the view of the lower federal appellate courts,[2] finds Cipollone, supra, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 applicable here. (Maj. opn, ante, 93 Cal.Rptr.2d at p. 40 et seq, 993 P.2d at p. 370 et seq.) In Cipollone, the high court did not address the meaning of FIFRA, but instead considered the proper interpretation of section 5(b) of the Public Health Cigarette Smoking Act of 1969 (hereafter the 1969 Cigarette Act). (Pub.L. No. 91-222 (Apr. 1, 1970) 84 Stat. 87, codified at 15 U.S.C. § 1331 et seq.) In explaining the scope of the 1969 Cigarette Act, the high court found the phrase "No requirement or prohibition based on *56 smoking and health ... with respect to the advertising or promotion of any cigarettes" to have broad preemptive effect, supplanting state common law causes of action for injuries caused by smoking. "The phrase `[n]o requirement or prohibition' sweeps broadly and suggests no distinction between positive enactments and common law; to the contrary, those words easily encompass obligations that take the form of common-law rules." (Cipollone, supra, 505 U.S. at p. 521, 112 S.Ct. 2608 (plur. opn. of Stevens, J.).) Finding "`no notable difference between the language in the 1969 Cigarette Act and the language in FIFRA'" (maj. opn., ante, 93 Cal.Rptr.2d at p. 41, 993 P.2d at p. 370, quoting Taylor AG Industries v. Pure-Gro (9th Cir.1995) 54 F.3d 555, 559), the majority then applies Cipollone's reasoning to the present case and concludes FIFRA preempts state common law.
With due respect to both the majority and the several federal appellate courts that have reached the same result (see, e.g., Taylor AG Industries v. Pure-Gro, supra, 54 F.3d at p. 560; Worm. v. American Cyanamid Co. (4th Cir.1993) 5 F.3d 744, 747), the two situations are not comparable. First and foremost, the preemption provision of the 1969 Cigarette Act is not prefaced with a provision specifically affirming the power of the states to regulate in its subject area of "smoking and health." Section 136v(b), by contrast, is so prefaced: section 136v(a) explicitly recognizes the power of the states to "regulate the sale or use of any federally registered pesticide or device in the State...." (7 U.S.C. § 136v(a).) As explained above, section 136v(a) is critically important in interpreting FIFRA's preemptive scope.
Faced with an express statement by Congress retaining the states' regulatory power, and in the absence of a "clear and manifest" expression of congressional intent to supplant the common law of the states, to maintain, as does the majority, that state tort law must be preempted because a successful tort lawsuit will "indirectly" affect pesticide labeling and packaging is untenable. Such indirect pressure on manufacturers to alter their pesticide labels is not embraced within the scope of FIFRA. For example, a state may, pursuant to section 136v(a), ban outright the use of an insecticide for which the Environmental Protection Agency (EPA) has approved a label pursuant to FIFRA. Although such direct state regulation would, of course, have the indirect effect of encouraging the manufacturer to change its label (e.g., "Not valid for use in California"), such indirect pressure on a manufacturer would nevertheless seem to be permissible. Indeed, what other meaning could section 136v(a) have?
Moreover, as the majority admits (maj. opn., ante, 93 Cal.Rptr.2d at p. 48, 993 P.2d at p. 377), common law causes of action based on other than a failure-to-warn theory are not preempted by FFRA. (See, e.g., Worm v. American Cyanamid Co., supra, 5 F.3d at p. 747 [in a FIFRA case, "[c]laims for negligent testing, manufacturing, and formulating, on the other hand, are not preempted"]; Lyall v. Leslie's Poolmart (E.D.Mich.1997) 984 F.Supp. 587 [same for claims of negligent design and manufacturing]; Higgins v. Monsanto Co. (N.D.N.Y.1994) 862 F.Supp. 751 [claim of strict liability based on design defect and express warranty]; Ackerman v. American Cyanamid Co. (Iowa 1998) 586 N.W.2d 208 [claims of negligent design and testing]; see also Kawamata Farms v. United Agri Products (1997) 86 Hawai'i 214, 948 P.2d 1055 [negligence, as well as strict liability and express warranty claims].) If plaintiffs, therefore, are successful in proving liability based on, e.g., negligent manufacture and testing, or negligently recommending a combination of Guthion and Morestan in conjunction with chemical surfactants, such litigation success could, of course, have the practical effect of convincing the manufacturer of these chemicals to change the labels so as to warn of the possibility of phytotoxicity *57 to emergent growth of nut trees, especially when used with chemicals that promote solubility.
The majority's interpretation of FIFRA thus leads to this conundrum: A state may directly regulate pesticides pursuant to section 136v(a)even to the point of banning their usethrough statutes or administrative regulations (so long as the state does not require labeling inconsistent with what the EPA has approved), even if such regulation has the indirect effect of encouraging manufacturers to alter their labels, but a state may not indirectly regulate pesticides by permitting tort suits at common law for damages, for the very same reason that such regulation has the indirect effect of encouraging manufacturers to alter their labels. This makes so little sense that the majority must be mistaken in concluding FIFRA preempts common law tort actions.
A second reason why reliance on Cipollone, supra, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407 is unjustified is that case's unwarranted focus on the word "requirement," a term common to both section 136v(b) as well as the preemption provision in the 1969 Cigarette Act. The majority, following the views of the lower federal appellate courts, essentially concludes that the broad definition of the word "requirement," as that term is used in section 5(b) of the 1969 Cigarette Act and interpreted in Cipollone, supra, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407, requires we interpret the same word in section 136v(b) to have a similarly broad effect. (See, e.g., maj. opn, ante, 93 Cal.Rptr.2d at p. 41, 993 P.2d at p. 370.) The word "requirement," however, is not some type of "preemption litmus paper." Instead, we must look beyond superficial semantic similarities to determine what Congress actually intended under the particular circumstances.
Illustrative of this point is the high court's decision in Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, a case that postdates Cipollone, supra, 505 U.S. 504, 112 S.Ct. 2608, 120 L.Ed.2d 407. In Medtronic, the defendant contended the MDA preempted the plaintiffs' claim that the defendant negligently designed a pacemaker. The relevant statute, 21 United States Code section 360k(a), provides that "no State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement  [¶] (1) which is different from, or in addition to, any requirement applicable under this chapter to the device, and [¶] (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this chapter." (Italics added.)
One could conclude that the use of the word "requirement" in the MDA must mean the same thing as in the 1969 Cigarette Act, and thus the MDA must preempt state common law causes of action. This was, in fact, the precise argument of the defendant in Medtronic: "Medtronic suggests that any common-law cause of action is a `requirement' which alters incentives and imposes duties `different from, or in addition to,' the generic federal standards that the [Federal Drug Administration] has promulgated in response to mandates under the MDA. In essence, the company argues that the plain language of the statute pre-empts any and all common-law claims brought by an injured plaintiff against a manufacturer of medical devices." (Medtronic, supra, 518 U.S. at p. 486, 116 S.Ct. 2240 (plur. opn. of Stevens, J.).)
The Supreme Court disagreed, finding the argument "not only unpersuasive," but "implausible" (Medtronic, supra, 518 U.S. at p. 487, 116 S.Ct. 2240 (plur. opn. of Stevens, J.); see also id. at p. 505, 116 S.Ct. 2240 (cone. opn. of Breyer, J.) [agreeing the MDA does not preempt state common law causes of action]), and its discussion of the issue is illuminating. "Under Medtronic's view of the statute, Congress effectively precluded state courts from affording state consumers any protection *58 from injuries resulting from a defective medical device. Moreover, because there is no explicit private cause of action against manufacturers contained in the MDA, and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective medical devices. Medtronic's construction of § 360k would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order `to provide for the safety and effectiveness of medical devices intended for human use,' 90 Stat. 539 (preamble to Act). It is, to say the least, `difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct,' Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), and it would take language much plainer than the text of § 360k to convince us that Congress intended that result.
"Furthermore, if Congress intended to preclude all common-law causes of action, it chose a singularly odd word with which to do it. The statute would have achieved an identical result, for instance, if it had precluded any `remedy' under state law relating to medical devices. `Requirement' appears to presume that the State is imposing a specific duty upon the manufacturer, and although we have on prior occasions concluded that a statute pre-empting certain state `requirements' could also preempt common-law damages claims, see Cipollone, 505 U.S., at 521-522 [112 S.Ct. 2608] (opinion of Stevens, J.), that statute did not sweep nearly as broadly as Medtronic would have us believe that this statute does.
"The pre-emptive statute in Cipollone was targeted at a limited set of state requirementsthose `based on smoking and health'and then only at a limited subset of the possible applications of those requirementsthose involving the `advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of the federal statute. See id., at 515 [112 S.Ct. 2608]. In that context, giving the term `requirement' its widest reasonable meaning did not have nearly the pre-emptive scope nor the effect on potential remedies that Medtronic's broad reading of the term would have in this suit. The Court in Cipollone held that the petitioner in that case was able to maintain some common-law actions using theories of the case that did not run afoul of the pre-emption statute. See id., at 524-530 [112 S.Ct. 2608]. Here, however, Medtronic's sweeping interpretation of the statute would require far greater interference with state legal remedies, producing a serious intrusion into state sovereignty while simultaneously wiping out the possibility of remedy for the Lohrs' alleged injuries. Given the ambiguities in the statute and the scope of the preclusion that would occur otherwise, we cannot accept Medtronic's argument that by using the term `requirement,' Congress clearly signaled its intent to deprive States of any role in protecting consumers from the dangers inherent in many medical devices." (Medtronic, supra, 518 U.S. at pp. 487-489 [116 S.Ct. 2240] (plur. opn. of Stevens, J.), fns. omitted, italics added; see also id. at pp. 505-508 [116 S.Ct. 2240] (cone. opn. of Breyer, J.) [agreeing the MDA does not preempt state tort law].)
This same reluctance to ascribe to Congress an unstated intention to deprive consumers of their historic protection under this state's common law is applicable to the determination of the scope of FIFRA's preemptive effect. According to the majority, Congress intended to eliminate from all 50 states lawsuits that are based on a defendant's common law duty to warn of the dangers of a product it has placed into the stream of commerce. This historic ability of persons to gain redress for injuries caused by defective products is not replaced by creation of a federal cause of action. Instead, consumers are left with *59 this meager "remedy": they may complain to the administrator of the EPA that the label on the pesticide is inadequate and the manufacturer should be made to change it. As the high court concluded in Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, with regard to the preemptive effect of the MDA, so too here it is implausible that Congress, through the use of such ambiguous statutory language, intended FIFRA to effect this sweeping change in the manner in which injured persons can gain compensation for their injuries. That FIFRA concerns a category of commercial products that, by design, are intended to kill living organisms and thus, by their nature, are potentially harmful to the biological environment and our very lives supplies further evidence that Congress could not have intended the broad preemptive effect now endorsed by the majority. Some post-Medtronic courts agree. (Brown v. Chas. H. Lilly Co. (1999) 161 Or.App. 402, 985 P.2d 846; Kawamata Farms v. United Agri Products, supra, 86 Hawai'i 214, 948 P.2d 1055 [negligence, strict liability and express warranty claims not preempted by FIFRA].)
Does it make sense to interpret FIFRA to preempt positive law, in the form of statutes and regulations, but not to preempt suits at common law? Given the reality that suits at common law can have an indirect regulatory effect on the labeling of products, a decision that suits at common law are not preempted by FIFRA will lead to a situation in which states may not directly regulate labeling, but may indirectly do so. This state of affairs, however, is not unlike the situation the high court recognized in Silkwood v. Kerr-McGee Corp., supra, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (Silkwood). In that case, the Supreme Court concluded that in passing the Price-Anderson Act (Pub.L. No. 85-256 (Sept. 2, 1957) 71 Stat. 576), an amendment to the Atomic Energy Act of 1954 (codified at 42 U.S.C. § 2011 et seq.), Congress intended that, despite the federal Atomic Energy Commission's exclusive regulatory power over safety matters in nuclear facilities, persons injured in such facilities remained free to utilize state tort remedies. "No doubt there is a tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a State may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." (Silkwood, supra, at p. 256, 104 S.Ct. 615; see also Goodyear Atomic Corp. v. Miller (1988) 486 U.S. 174, 186, 108 S.Ct. 1704, 100 L.Ed.2d 158 [in a nuclear regulatory case, "Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not"].)[3]
As in Silkwood, supra, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443, it must be assumed, in the absence of a clear expression of congressional intent, that Congress intended to tolerate the tension between section 136v(b)'s grant of exclusive power to the EPA over pesticide labeling and the availability of state tort remedies that could have an indirect effect on the content of such labels.

IV
Section 136v(a) expressly affirms state regulatory power in the area of pesticides and thus suggests we should interpret FFRA's preemptive effect narrowly. Although Cipollone, supra, 505 U.S. 504, 112 *60 S.Ct. 2608, 120 L.Ed.2d 407 suggested the word "requirement" be given a broad interpretation in the preemption context, the high court's later decision in Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 revealed that such an interpretation is too simplistic. There being no clear and manifest expression of Congress's intent in FIFRA to preempt state tort law (Mortier, supra, 501 U.S. 597, 111 S.Ct. 2476, 115 L.Ed.2d 532), and it appearing implausible Congress intended to remove the remedies that historically have been available to compensate people for injuries caused by unreasonably dangerous commercial products, I conclude the majority's expansive view of FIFRA's preemptive effect is erroneous. I thus respectfully dissent.
MOSK, J, concurs.
NOTES
[1] All statutory references are to title 7 of the United States Code unless otherwise indicated.
[2] "Only four Justices joined in the portion of the opinion [holding] the Public Health Cigarette Smoking Act of 1969 preempted claims based upon state failure-to-warn claims. However, in his opinion concurring in part and dissenting in part, Justice Scalia, joined by Justice Thomas, stated that he agreed with the following language of the plurality opinion: `that the language of the . . . Act plainly reaches beyond [positive] enactments; that the general tort-law duties petitioner invokes against the cigarette companies can, as a general matter, impose "requirements or prohibitions" within the meaning of [§ 1334(b)]; and that the phrase "state law" as used in [§ 1334(b)] embraces State common law....' Cipollone v. Liggett Group, Inc., ... 112 S.Ct. at 2634 (citations and internal quotations omitted). Thus, the holding of the plurality opinion that the language of § 1334(b) preempted the plaintiff's failure-to-warn claim can fairly be said to constitute the view of the Court because six members of the Court concurred in that conclusion. See King v. E.I. Du Pont De Nemours & Co., 996 F.2d 1346, 1349 (1st Cir.), cert. dismissed, [510 U.S. 985] 114 S.Ct. 490, 126 L.Ed.2d 440 (1993); Shaw v. Dow Brands, Inc., 994 F.2d 364, 370 n. 4 (7th Cir. 1993)." (MacDonald v. Monsanto Co., supra, 27 F.3d at p. 1024, fn. 1.)
[3] The concurring and dissenting opinion sets up a Catch-22 by imposing a burden defendants cannot reasonably be expected to carry. In order to establish preemption, defendants would have to show that "the EPA, after full consideration of information relevant to the allegation that combined use of its products causes crop damage, has determined that no change in the products' labels is required." (See cone, and dis. opn., of Kennard, J., post, 93 Cal.Rptr.2d at p. 51, 993 P.2d at p. 380.) The EPA would be unlikely ever to make such a determination. If few reports of crop damage were brought to the EPA's attention, or if the state failure-to-warn actions claiming such damage were unsuccessful, the agency would have no reason to expend the resources required to reassess the adequacy of a label. On the other hand, if a substantial number of successful failure-to-warn actions claiming crop damage were brought to the EPA's attention, the agency would hardly be likely to affirm the label. And even if a substantial number of unsuccessful state failure-to-warn suits claiming crop damage were to prompt the EPA to reconsider and reaffirm a product's label, the ability of a defendant to assert preemption would depend upon whether a particular suit were brought before or after the critical mass had been reached. In short, the rule proposed in the concurring and dissenting opinion would be as destructive to the ideal of reaching like results in like cases as it would be to Congress's goal of ensuring uniformity in pesticide labeling by preempting state failure-to-warn claims.
[1] Or, in the words of plaintiffs' interrogatory answer: "Surfactants in aqueous solution that reach certain threshold concentrations solubilize epicuticular and cuticular waxes on the surface of plant tissue, such as on the surfaces of leaves, and can be inherently phytotoxic."
[2] 1 recognize the lower federal appellate courts are largely in agreement with the majority, and I do not lightly reject their views. Nevertheless, "the decisions of the lower federal courts are persuasive but not controlling" (In re Tyrell J. (1994) 8 Cal.4th 68, 79, 32 Cal.Rptr.2d 33, 876 P.2d 519, italics added; see also People v. Bradley (1969) 1 Cal.3d 80, 86, 81 Cal.Rptr. 457, 460 P.2d 129 [lower federal court decisions entitled to great weight but are not binding]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 942, pp. 983-984 [same]), and we have an independent constitutional obligation to interpret the federal Constitution, which, of course, includes the supremacy clause of article VI, clause 2. (See Cal. Const., art. XX, § 3 [judicial officers swear an oath to support the Constitution of the United States].) In any event, the majority of federal appellate court decisions cited by the majority predate the high court's decision in Medtronic, supra, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700, which, as explained, post, found state tort law was not preempted despite the statute's use of the word "requirement."
[3] Congress later amended the law to overrule the part of the Silkwood decision that interpreted the Price-Anderson Act to permit recovery of punitive damages under state law. (See 42 U.S.C. § 2210(s); see also Nieman v. NLO, Inc. (6th Cir. 1997) 108 F.3d 1546, 1551, fn. 5.)